Sarah McMillan
WildEarth Guardians
P.O. Box 7516
Missoula, Montana 59807
Tel: 406-549-3895
smcmillan@wildearthguardians.org

Matthew K. Bishop
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59603
Tel: 406-324-8011
bishop@westernlaw.org

*Counsel for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, | Case No.: |
| Plaintiff, | COMPLAINT |
| vs. | |
| CRAIG HOOVER; DANIEL ASHE; UNITED STATES FISH AND WILDLIFE SERVICE; SALLY JEWELL; AND THE UNITED STATES DEPARTMENT OF THE INTERIOR, | |
| Defendants. | |

# INTRODUCTION

1. Plaintiff WildEarth Guardians hereby respectfully files this civil action for declaratory and injunctive relief against Defendants Craig Hoover *et al.* ("the Service") for violating the National Environmental Policy Act ("NEPA"). The Service administers and implements a federal export program that allows certain animal pelts and parts to be exported from this country pursuant to the Convention on International Trade in Endangered Species ("CITES"). The Service's CITES export program authorizes the export of pelts and parts from specific furbearer species, including bobcats, Canada lynx (captive-bred specimens or specimens from Alaska), gray wolves, brown bears, and river otters which could not lawfully occur without its approval. The export of these furbearer species' pelts and parts creates, promotes, and facilitates an international market for trade in these animals and creates more incentive to trap, kill, and sell the pelts and parts from these animals. This has caused and continues to cause the death and injury to thousands of these species and thousands of other wildlife species that are not targeted. The Service's CITES export program for furbearer species is a major federal agency action that affects the environment. The Service has illegally failed to evaluate the CITES export program for furbearer species and alternatives to it pursuant to NEPA.

# JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 704.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (e).

4.     Final agency action subject to judicial review exists pursuant to 5 U.S.C. §§ 702 and 704. This Court has authority to issue the relief requested under 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. §§ 702 and 706. There is a present and actual controversy between the parties.

## PARTIES

5.     Plaintiff WildEarth Guardians is a non-profit conservation group headquartered in Santa Fe, New Mexico, with offices in Colorado, Montana, Oregon, Arizona, California, and Wyoming. WildEarth Guardians' mission is to protect and restore the wildlife, wild places, wild rivers, and the natural health of the American West. This mission encompasses ensuring the long-term survival and recovery of wildlife throughout the West. WildEarth Guardians has more than 168,000 members and supporters. WildEarth Guardians brings this action on behalf of its members and supporters.

6.     Many of WildEarth Guardians' members and supporters have been and continue to be adversely affected by the Service's actions and/or inactions described in this pleading, because they have resulted in and continue to result in death, harm, and injury to bobcats, wolves, Canada lynx, bears, and other animals. The Service has disregarded these members and supporters' rights to be fully informed of, to participate in, and to seek to influence agency decisions that harm bobcats, wolves, bears, and other animals. Members and supporters of WildEarth Guardians have, among other interests, aesthetic, professional, recreational, personal, and spiritual interests in bobcats, wolves, bears, and other animals. If this Court issues the relief that WildEarth Guardians requests, the harm to WildEarth Guardians' members and supporters will be alleviated and/or lessened.

7. Defendant Craig Hoover is Chief of the Service's Division of Management Authority. Mr. Hoover is sued in his official capacity. He is responsible for agency actions challenged herein.

8. Defendant Daniel Ashe is the Director of the U.S. Fish and Wildlife Service. Mr. Ashe is sued in his official capacity. He is responsible for agency actions challenged herein.

9. Defendant U.S. Fish and Wildlife Service is a federal agency within the U.S. Department of the Interior. The Service is responsible for agency actions challenged herein.

10. Defendant Sally Jewell is the Secretary of the Interior. Ms. Jewell is sued in her official capacity. She is responsible for agency actions challenged herein.

11. Defendant U.S. Department of the Interior is a federal department responsible for applying and implementing federal laws and regulations at issue in this complaint.

**FACTS**

12. CITES is an international treaty among countries. CITES was negotiated in 1973 in Washington, D.C., at a conference attended by delegations from 80 countries. The United States ratified the CITES treaty in 1973, and it became effective in 1975. CITES regulates the international trade of certain animal and plant species. The United States is a signatory to CITES. The United States implements CITES through the Endangered Species Act ("ESA").

13. Animal species covered by CITES are listed in three Appendices. Appendix I is comprised of species threatened with extinction that are or may be affected by trade. Appendix II is comprised of species that are not presently threatened with

extinction, but may become so if their trade is not regulated. Appendix II includes species in which trade is controlled to avoid utilization incompatible with their survival, or with the survival of Appendix I species because of factors such as similarity of appearance to other species. Appendix III is comprised of species protected in at least one country that is a signatory to CITES, and the country has asked other CITES parties to assist it in controlling trade in that species or those species.

14. Appendix II includes furbearer species that are available for export from the United States. These furbearer species include bobcat (*Lynx rufus*), Canada lynx (*Lynx Canadensis*; currently only captive-bred specimens and specimens from Alaska are available for export), gray wolf (*Canis lupus*), river otter (*Lontra Canadensis*), and brown bear (*Ursus arctos*).

15. The export of the five furbearer species covered by CITES and listed in Appendix II, must be authorized and approved for export through a tagging and permitting system. Each party (country) to CITES must designate a "management authority" to administer the permitting system. Each party (country) to CITES must designate a "scientific authority" to advise it on the effects of trade in the species on the status of the species.

16. The Service includes an international branch that includes the "management authority" and the "scientific authority" for its administration of CITES. For the United States, the Service's Division of Management Authority ("DMA") carries out and administers the CITES export program for Appendix II furbearer species. For the United States, the Service's Division of Scientific Authority ("DSA")

provides advice on the effects of the CITES export program for Appendix II furbearers.

17.    In accordance with CITES, the DMA must ensure that certain requirements are met before the furbearer species listed in Appendix II of CITES are exported from the United States. Generally, before a species listed in Appendix II can be exported from the United States, the DMA must determine that the specimens to be exported were legally acquired. The DSA must determine that the export of specimens of that species will not be detrimental to the survival of that species, or to species similar in appearance.

18.    To implement the CITES export program for Appendix II furbearer species, the Service has promulgated, amended, and revised regulations. 50 C.F.R. § 23. In 1977, the Service promulgated regulations implementing the CITES export program for Appendix II furbearers. In 2007, 2008, and 2014, the Service promulgated revisions to the regulations implementing the CITES export program for Appendix II furbearers. To implement and streamline the CITES export program for Appendix II furbearers, the Service also established a program for issuing CITES permits and export tags to states and tribes interested in participating in the program and exporting furbearer species listed in Appendix II. States or tribes interested in participating in the program must apply to the Service's DMA for review and approval. The DMA requires states or tribes to submit information on population condition, harvest control measures, total allowable harvest, tagging or marking requirements, habitat status, and any management plans for the species in the state or tribal area before being approved. The DMA has discretion whether to approve a state or tribal application to be

included in the CITES export program for Appendix II furbearers. The Service has determined that its CITES export program for Appendix II furbearers is categorically excluded from NEPA review.

19.     If the DMA approves a state or tribal export program, the Service distributes CITES export tags annually to approved states and tribes. Tags are distributed directly from the manufacturer to the state or tribe, which, in turn, distributes the pelt tags to trappers, hunters, or other individuals seeking to trap, kill, or otherwise collect the furbearer species for export. To be eligible for export from the United States, all Appendix II furbearer species' skins and pelts must be tagged with serially unique and non-removable CITES tags. Properly tagged skins and pelts may then be exported from the United States through a designated wildlife port. A valid CITES export permit, listing the pelt tag numbers, must also accompany all exported skins and pelts. State or tribal programs are reviewed by the DMA periodically to verify that they still qualify for inclusion in the CITES export program for Appendix II furbearers.

20.     Montana is among a number of states approved by the DMA for the export of bobcat pelts pursuant to the CITES export program for Appendix II furbearer species. In 2014, the Service revised its regulations to include the brown bear and gray wolf in the contiguous United States in the CITES export program for Appendix II furbearers. In January, 2015, the Service approved Montana's request to export gray wolf pelts and parts from Montana (in addition to bobcat pelts and parts) pursuant to the newly revised CITES export program for Appendix II furbearers. Montana stated that this approval was a "big change" in terms of creating more opportunity for trappers to sell wolf pelts internationally. The

Service approved of the export of up to 200 gray wolf hides/skins annually from Montana. The approval period was initially for one year but has been extended so long as Montana complies with tagging and reporting conditions set by the Service.

21. The export of pelts or parts from furbearer species listed in Appendix II, including bobcat and gray wolf pelts from Montana and other states and tribal areas, is also possible from a state or tribal area that is not participating in the CITES export program for Appendix II furbearers (or has not been approved by DMA in the program). In this situation, each exporter must apply to the Service for a CITES export permit. Before the Service may issue export permits, the Service's DMA needs to review applications on a shipment-by-shipment basis and make the requisite findings regarding legal acquisition and non-detriment.

22. In states or tribal areas where bobcat pelts or parts may be exported under CITES export program for Appendix II furbearers, conibear, or body-gripping, traps are used to catch or collect bobcats. Conibear or body-gripping traps do not mutilate trapped animals. Conibear or body-gripping traps do not perforate or puncture the pelt or skin of trapped animals. Some individuals who use conibear or body-gripping traps use bait to attract bobcats to the traps. Those who use conibear or body-gripping traps when seeking to catch or collect bobcats often use beaver meat or carcasses as bait. Animals other than bobcats are attracted to beaver meat or carcasses. Animals other than bobcats are attracted to other bait used to attract bobcats. Animals other than bobcats are caught or collected in conibear or body-gripping traps set for bobcats.

23. In states or tribal areas where bobcat pelts or parts may be exported under CITES export program for Appendix II furbearers, neck snares are used to catch or

collect bobcats. If an animal caught or collected in a neck snare struggles to free itself, the snare can tighten. A neck snare can asphyxiate a snared animal. Bobcats have been asphyxiated in neck snares. Neck snares set for bobcats snare animals other than bobcats. Individuals who use neck snares to catch or collect bobcats use bait to attract bobcats to the snares. Animals other than bobcats are attracted to bait used with snares. Animals other than bobcats have been asphyxiated in neck snares set for bobcats.

24. In states or tribal areas where bobcat pelts or parts may be exported under CITES export program for Appendix II furbearers, foothold or leghold traps are used to catch or collect bobcats. Bobcats caught in foothold or leghold traps can be injured or die. Animals other than bobcats are caught or collected in foothold or leghold traps used to catch or collect bobcats. Animals caught or collected in foothold or leghold traps set for bobcats are injured or die.

25. In 2014, approximately 57,414 bobcat skins were exported from the United States for commercial purposes under CITES export program for Appendix II furbearers. In 2014, approximately three bobcat trophies were exported from the United States for commercial purposes under CITES export program for Appendix II furbearers. In 2014, approximately three bobcat skins were exported from the United States for personal purposes under CITES export program for Appendix II furbearers. In 2014, approximately five bobcat trophies were exported from the United States under CITES export program for Appendix II furbearers

26. In Montana, conibear or body-gripping traps are used. Conibear or body-gripping traps can catch or collect wolves and other animals. Some individuals who use conibear or body-gripping traps use bait to attract animals to the traps.

Beaver meat or carcasses are often used as bait by those who use conibear or body-gripping traps. Animals other than wolves are attracted to beaver meat or carcasses. Animals other than wolves are attracted to other bait used to attract wolves. Animals other than wolves are caught or collected in conibear or body-gripping traps set for wolves.

27. In Montana, neck snares are used and can catch or collect wolves. Wolves have been asphyxiated in neck snares. Neck snares set for wolves snare animals other than wolves. Individuals who use neck snares to catch or collect wolves use bait to attract wolves to the snares. Animals other than wolves are attracted to bait used with snares. Animals other than wolves are snared in neck snares set for wolves. Animals other than wolves have been asphyxiated in neck snares set for wolves.

28. In Montana, foothold or leghold traps are used to catch or collect wolves. Wolves caught in foothold or leghold traps can be injured or die. Animals other than wolves are caught or collected in foothold or leghold traps used to catch or collect wolves. Animals caught or collected in foothold or leghold traps set for wolves can be injured or die. Animals caught or collected in foothold or leghold traps set for wolves have been injured or killed.

29. In 2014, approximately two gray wolf skins were exported from the United States for commercial purposes. In 2014, approximately three wolf skins were exported from the United States for personal purposes. In 2014, approximately eight gray wolves were exported from the United States as hunting trophies. In 2014, approximately three gray wolves were exported from the United States as personal trophies. In 2014, approximately one gray wolf was exported from the

United States as a commercial trophy. In 2014, approximately 26 gray wolf garments were exported from the United States for circus or traveling exhibition purposes. In 2014, approximately four gray wolf garments were exported from the United States for commercial purposes.

30. Online markets and other technological advances since adoption of CITES have made it possible to sell and ship furbearers listed in Appendix II to many parts of the world. There is high international demand for bobcat and gray wolf pelts and prices for such pelts are near or at record levels. The CITES export program for Appendix II furbearers creates or facilitates an international market for the export and sale of pelts, parts, trophies, garments, and other components of bobcats, gray wolves, and other Appendix II furbearers trapped, caught, killed, or otherwise obtained in approved states or tribal areas. The international market for pelts, parts, trophies, garments, and other components of these animals creates or maintains incentive for individuals to trap, catch, kill, or otherwise obtain these animals. The Service recognizes that while habitat destruction is the major reason why species are in decline (and sometimes threatened with extinction), the international trade in animal pelts and parts authorized by the CITES export program for Appendix II furbearers is also a significant contributing factor.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

31. Plaintiffs hereby incorporate all preceding paragraphs.

32. NEPA provides that all federal agencies shall prepare, for every major Federal action significantly affecting the quality of the human environment, a detailed environmental impact statement ("EIS") that addresses, among other

things, (1) the environmental impact of the proposed action (2) any adverse environmental effects which cannot be avoided, and (3) alternatives to the proposed action. 42 U.S.C. § 4332(C)(i)-(iii). "Major federal action" includes actions with effects that may be major and which are potentially subject to federal control and responsibility. 40 C.F.R. § 1508.18. "Actions" include "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies." 40 C.F.R. § 1508.18(a). Federal agencies may prepare an environmental assessment ("EA") to determine whether an EIS is required. 40 C.F.R. § 1508.9.

33. The Service's CITES export program for Appendix II furbearers is a major federal action that significantly affects the human environment. The Service's CITES export program for Appendix II furbearers includes the promulgation, amendment, and revision of regulations, approval (and periodic review) of state and tribal programs to export species covered under CITES export program for Appendix II furbearers, the annual issuance of export tags to approved states and tribes, and the issuance of export permits to exporters (from non-approved states or tribal areas) on a shipment by shipment basis.

34. The Service has never prepared a NEPA analysis (EIS or EA) for any aspect of its CITES export program for Appendix II furbearers. The Service never prepared a NEPA analysis (EIS or EA) for its regulations (promulgation, amendment, and revision) implementing the CITES export program for Appendix II furbearers. The Service never prepared a NEPA analysis (EIS or EA) for its approval and periodic review of state and tribal programs for inclusion in the CITES export program for Appendix II furbearers or for its issuance of CITES

export permits to exporters from non-approved states and tribal areas on a shipment by shipment basis. The Service never prepared a NEPA analysis (EIS or EA) for its annual issuance of CITES export tags to states and tribes participating in the CITES export program for Appendix II furbearers. The Service has determined that its CITES export program for Appendix II furbearers is categorically excluded from NEPA review.

35. The Service's determination that its CITES export program for Appendix II furbearers is categorically excluded from NEPA review and related failure to prepare a NEPA analysis (EIS or EA) for its CITES export program for Appendix II furbearers as required by NEPA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706 (1).

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

A.   Declare the Service has violated and continues to violate NEPA as Plaintiffs allege;

B.   Enjoin the Service from authorizing or otherwise facilitating the export of Appendix II furbearers, including bobcat and gray wolf pelts or parts pursuant to the CITES export program for Appendix II furbearers, pending compliance with NEPA;

C.   Remand this matter to the Service with instruction to comply with NEPA by a specific date;

D.   Award Plaintiffs their attorneys' fees, costs and expenses of litigation;

E.	Issue any other relief this Court deems necessary, just, or proper or that Plaintiffs may subsequently request.

Dated this 3rd day of May, 2016.

Respectfully submitted,

<u>/s/ Matthew Bishop</u>
Matthew  Bishop

<u>/s/ Sarah McMillan</u>
Sarah McMillan

*Counsel for Plaintiff*