Sarah McMillan
WildEarth Guardians
P.O. Box 7516
Missoula, Montana 59807
Tel: 406-549-3895
smcmillan@wildearthguardians.org

Matthew K. Bishop
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59603
Tel: 406-324-8011
bishop@westernlaw.org

Peter M.K. Frost, *pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Tel: 541-359-3238
frost@westernlaw.org

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, | CV 16-65-M-DWM |
| Plaintiff, | |
| | PLAINTIFF'S |
| vs. | SUPPLEMENTAL AND |
| | AMENDED COMPLAINT |
| CRAIG HOOVER et al., | |
| Defendants, | |
| MONTANA TRAPPERS ASSOCIATION, et al., | |
| Defendant-Intervenors. | |

## INTRODUCTION

1.      Plaintiff WildEarth Guardians ("Guardians") hereby respectfully files this supplemental and amended complaint, continuing its civil action for declaratory and injunctive relief against Defendants Craig Hoover *et al.* ("the Service") for violating the National Environmental Policy Act ("NEPA") and, now, the Endangered Species Act ("ESA"). Pursuant to the Convention on International Trade in Endangered Species ("CITES"), the Service administers and implements a wildlife export program that allows animal pelts and parts to be exported from this country. The CITES wildlife export program authorizes and facilitates the export of pelts and parts from furbearer species, including bobcats and gray wolves, which could not lawfully occur without the Service's approval. The export of species' pelts and parts creates, promotes, and facilitates an international market for trade in these species and creates more incentive to trap, kill, and sell their pelts and parts. This has caused and continues to cause the death and injury to thousands of these species, and other wildlife species that are not the intended target but are caught as bycatch.

2.      The CITES wildlife export program is a major federal agency action that affects the environment. The Service prepared an environmental assessment ("EA") under NEPA that purports to evaluate the effects of the national CITES wildlife export program. Plaintiff hereby challenges the adequacy of the EA, and the Service's decision that it is not required to prepare an environmental impact statement ("EIS") to evaluate the effects of the CITES wildlife export program. The Service has also consulted under Section 7 of the ESA as to effects of the export of bobcat pelts under the CITES wildlife export program on federally

protected Canada lynx, and has issued a Biological Opinion and Incidental Take Statement ("ITS"). Plaintiff hereby challenges the Biological Opinion and ITS.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 704.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (e).

5.     Final agency action subject to judicial review exists pursuant to 5 U.S.C. §§ 702 and 704. This Court has authority to issue the relief Guardians requests under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 702 & 706. There is a present and actual controversy between the parties.

## PARTIES

6.     WildEarth Guardians is a non-profit conservation group headquartered in Santa Fe, New Mexico, with additional offices in Colorado, Montana, Oregon, Arizona, and Washington. Guardians' mission is to protect and restore the wildlife, wild places, wild rivers, and health of the American West. This mission encompasses ensuring the long-term survival and recovery of wildlife throughout the West. Guardians has approximately 215,000 members and supporters. Guardians brings this action on behalf of its members and supporters.

7.     Many of Guardians' members and supporters have been and continue to be adversely affected by the Service's actions as described in this pleading, because they have resulted in and continue to result in death, harm, and injury to targeted bobcats and gray wolves, and other animals that are not targeted. Members and supporters of Guardians have, among other interests, aesthetic, professional, recreational, personal, and spiritual interests in bobcats, gray wolves, Canada lynx and other non-target animals. Members and supporters of Guardians live near,

recreate in and visit, and have specific plans to return soon to recreate in and visit lands in Montana and other states that provide habitat for bobcats, gray wolves, Canada lynx and other non-target animals subject to trapping or other forms of capture to obtain pelts or parts for export. These members and supporters of Guardians are affected by trapping and other capture methods in Montana and other states that harm or reduce numbers of bobcats, gray wolves, and other non-target animals in these areas, and make it less likely that they will see these animals, see evidence of these animals, photograph these animals, enjoy looking for these animal and evidence of these animals, or experience habitat in which these animals live. These members and supporters of Guardians have not been compelled to participate in this lawsuit. The Service has disregarded these members and supporters' rights to be fully informed of, to participate in, and to seek to influence agency decisions that harm bobcats and gray wolves, Canada lynx and other non-target animals.

8.      If this Court issues the relief that Guardians requests or will request, the harm or injury to Guardians and its members and supporters will be alleviated and/or lessened. A court order that the EA is invalid, and remanding the matter to the Service with instructions to prepare a sufficient NEPA analysis, as well as vacatur of the deficient Biological Opinion and ITS, would likely lessen the extent or amount of trapping, capture, or killing of species subject to export from approved states and tribal areas, including Montana, as well as other species, and thereby help redress Guardians' and its members' and supporters' injuries.

9.      Defendant Craig Hoover is Chief of the Service's Division of Management Authority. Mr. Hoover is sued in his official capacity. He is responsible for agency actions challenged herein.

10.     Defendant Greg Sheehan is the Acting Director of the U.S. Fish and Wildlife Service. Mr. Sheehan is sued in his official capacity. He is responsible for agency actions challenged herein.

11.     Defendant U.S. Fish and Wildlife Service is a federal agency within the U.S. Department of the Interior. The Service is responsible for agency actions challenged herein.

12.     Defendant Ryan Zinke is the Secretary of the Interior. Mr. Zinke is sued in his official capacity. He is responsible for agency actions challenged herein.

13.     Defendant U.S. Department of the Interior is a federal department responsible for applying and implementing federal laws and regulations at issue in this complaint.

## FACTS

14.     CITES is an international treaty among countries. CITES was negotiated in 1973 in Washington, D.C., at a conference attended by delegations from 80 countries. The United States ratified the CITES treaty in 1973. The CITES treaty became effective in 1975. CITES regulates international trade of certain animal and plant species. Currently, 183 countries are signatories to CITES. The United States is a signatory to CITES. The United States implements CITES through the ESA.

15.     Animal species covered by CITES are listed in three Appendices. Appendix I is comprised of species threatened with extinction that are or may be affected by

trade. Appendix II is comprised of species that are not presently threatened with extinction, but may become so if their trade is not regulated. Appendix II includes species in which trade is controlled to avoid utilization incompatible with their survival, or with the survival of Appendix I species because of factors such as similarity of appearance to other species. Appendix III is comprised of species protected in at least one country that is a signatory to CITES, and the country has asked other CITES parties to assist it in controlling trade in that species or those species.

16.     Each party (country) to CITES must designate a "management authority" to administer its permitting system. Each party to CITES must designate a "scientific authority" to advise it on effects of the status of the species and its trade. The Service includes an international branch that includes the "management authority" and the "scientific authority" for administering CITES. For the United States, the Division of Management Authority ("Management Authority") carries out and administers the CITES wildlife export program. For the United States, the Division of Scientific Authority ("Scientific Authority") provides advice on the effects of the CITES wildlife export program.

17.     Appendix II of the CITES wildlife export program includes species that are made available for export from the United States. These species include bobcat (*Lynx rufus*), gray wolf (*Canis lupus*), river otter (*Lontra Canadensis*), brown bear (*Ursus arctos*), and Canada lynx (*Lynx Canadensis*). Under the CITES wildlife export program, the export of any of these species must be authorized and approved by the Service. The Service maintains a tagging and permitting system to control and facilitate exports of these species. States or tribes may apply to the

Service for permission to have Appendix II species trapped, caught, or otherwise obtained within the state or tribal area available for export. The Service has discretion whether to approve an application from a state or tribe to participate in the CITES wildlife export program.

18.     In accordance with CITES, the Management Authority must ensure that requirements are met before a species listed in Appendix II is exported from the United States. Before a species listed in Appendix II can be exported from the United States, the Management Authority must determine that the specimens to be exported were legally acquired. The Scientific Authority must also determine that the export of specimens of that species will not be detrimental to the survival of that species, or to species listed under CITES due to similarity of appearance.

19.     To implement the CITES wildlife export program, the Service has promulgated and revised regulations. In 1977, the Service promulgated regulations implementing the CITES wildlife export program for Appendix II furbearers. The Service has since revised the regulations implementing the CITES wildlife export program. To implement and streamline the CITES wildlife export program, the Service established a program for issuing CITES permits and export tags to states and tribes interested in participating in the program and exporting furbearer species listed in Appendix II. States or tribes interested in participating in the program must apply to the Management Authority for review and approval. The Management Authority requires states or tribes to submit information on population condition, harvest control measures, total allowable harvest, tagging or marking requirements, habitat status, and any management plans for the species in the state or tribal area before being approved. The Management Authority has

discretion whether to approve a state or tribal application to be included in the CITES wildlife export program.

20.    If the Management Authority approves a state or tribal export program, the Service distributes CITES export tags annually to approved states and tribes. Tags are distributed directly from the manufacturer to the state or tribe, which, in turn, distributes the tags to trappers, hunters, or other individuals seeking to trap, kill, or otherwise collect furbearer species. To be eligible for export from the United States, Appendix II furbearer species' skins and pelts must be tagged with serially unique and non-removable CITES tags. Properly tagged skins and pelts may then be exported from the United States through a designated wildlife port. A valid CITES wildlife export permit, listing pelt tag numbers, must accompany all exported skins and pelts. State or tribal programs are reviewed by the DMA periodically to determine if they still qualify to be included in the CITES wildlife export program.

21.    Montana is among the states approved by the Service for the export of bobcat pelts pursuant to the CITES wildlife export program. In 2014, the Service revised its regulations to include the gray wolf in the contiguous United States in the CITES wildlife export program. In January, 2015, the Service approved Montana's request to export gray wolf pelts and parts from Montana pursuant to the CITES wildlife export program. Montana stated that this approval was a "big change" in terms of creating more opportunity for trappers to sell wolf pelts and parts internationally. The Service approved the export of up to 200 gray wolf pelts and parts annually from Montana. The approval period was initially for one year.

The Service has extended its approval of Montana's gray wolf export as long as Montana complies with tagging and reporting conditions set by the Service.

22.     The export of pelts or parts from furbearer species listed in Appendix II of CITES is possible from a state or tribal area that is not participating in the CITES wildlife export program (or has not been approved as such by the Management Authority). In this situation, a potential exporter must apply to the Service for a CITES wildlife export permit. Before the Service may issue such a permit, the Management Authority must review the application on a shipment-by-shipment basis, and make requisite findings regarding legal acquisition and non-detriment.

23.     In some states or tribal areas where bobcat pelts or parts may be exported under the CITES wildlife export program, conibear, or body-gripping, traps are used to catch or collect bobcats. Some people who use conibear or body-gripping traps use bait to attract bobcats to the traps. Some people who use conibear or body-gripping traps when seeking to catch or collect bobcats use beaver meat or carcasses as bait. Animals other than bobcats are attracted to bait used to attract bobcats. Animals other than bobcats are attracted to beaver meat or carcasses used to attract bobcats. Animals other than bobcats are caught or collected in conibear or body-gripping traps set for bobcats.

24.     In some states or tribal areas where bobcat pelts or parts may be exported under the CITES wildlife export program, snares are used to catch or collect bobcats. If an animal caught or collected in a snare struggles, the snare can tighten. A neck snare can asphyxiate a snared animal. Bobcats have been asphyxiated in neck snares. Neck snares set for bobcats snare animals other than bobcats. Some people who use snares to catch or collect bobcats use bait to attract bobcats to the

snares. Animals other than bobcats are attracted to bait used with snares. Animals other than bobcats have been snared in snares set for bobcats. Animals other than bobcats have been asphyxiated in neck snares set for bobcats.

25.     In some states or tribal areas where bobcat pelts or parts may be exported under the CITES wildlife export program, foothold or leghold traps are used to catch or collect bobcats. Some individuals who use foothold or leghold traps to catch or collect bobcats use bait to attract bobcats. Animals other than bobcats are attracted to bait used with foothold or leghold traps. Bobcats caught in foothold or leghold traps can be injured or die. Animals other than bobcats are caught or collected in foothold or leghold traps used to catch or collect bobcats. Animals caught or collected in foothold or leghold traps set for bobcats are injured or die.

26.     In 2014, approximately 57,414 bobcat skins were exported from the United States for commercial purposes under the CITES export program for Appendix II furbearers. In 2014, approximately three bobcat trophies were exported from the United States for commercial purposes under CITES export program for Appendix II furbearers. In 2014, approximately three bobcat skins were exported from the United States for personal purposes under CITES export program for Appendix II furbearers. In 2014, approximately five bobcat trophies were exported from the United States under CITES export program for Appendix II furbearers

27.     In Montana, trappers use a variety of methods to capture animals. These include snares, conibear or body-gripping traps, leghold or foothold traps, and leaning-pole sets, to catch animals. All of these methods can capture a wide variety of animals. Some people who use traps and snares use bait to attract animals to the traps. Meat or carcasses are often used as bait by those who use conibear or body-

gripping traps. Animals other than those targeted are attracted to beaver meat or carcasses.. Animals other than targeted animals are caught or collected in conibear or body-gripping traps.

28.    In Montana, foothold or leghold traps are used to catch or collect wolves. Wolves caught in foothold or leghold traps can be injured or die. Animals other than wolves, including lynx, are caught or collected in foothold or leghold traps used to catch or collect wolves. Animals caught or collected in foothold or leghold traps set for wolves can be injured or die. Animals caught or collected in foothold or leghold traps set for wolves have been injured or killed.

29.    In 2014, approximately two gray wolf skins were exported from the United States for commercial purposes. In 2014, approximately three wolf skins were exported from the United States for personal purposes. In 2014, approximately eight gray wolves were exported from the United States as hunting trophies. In 2014, approximately three gray wolves were exported from the United States as personal trophies. In 2014, approximately one gray wolf was exported from the United States as a commercial trophy. In 2014, approximately 26 gray wolf garments were exported from the United States for circus or traveling exhibition purposes. In 2014, approximately four gray wolf garments were exported from the United States for commercial purposes.

30.    As of June 15, 2016, "exporter reported" quantities or pelts and parts of gray wolves from the United States in 2015 include approximately 94 gray wolf skins or trophies, and 142 gray wolf "specimens."

31.    As of June 15, 2016, "importer reporter" quantities of pelts or parts of bobcats from the United States include approximately 636 bobcat skins.

32.     Canada lynx are vulnerable to trapping and snaring. Canada lynx can be caught in traps and snares set for other species. Canada lynx occur or are present in areas where states and tribes allow trapping for other species, such as bobcat, wolverine, fisher, and wolves. Canada lynx are relatively easy to capture or trap. Canada lynx have little fear of human scent. Canada lynx respond to baits and lures set in traps or snares for other species. Canada lynx can be attracted using visual attractants.

33.     Canada lynx have been caught in traps and snares set for other species. The precise number of lynx caught or trapped in traps or snares set for other species in the contiguous United States since 2000 is unknown. In Maine, from 2000-2012, at least 59 Canada lynx were captured in traps or snares set for other species. At least two additional Canada lynx mortalities in traps or snares set for other species have occurred in Maine since 2012. In Minnesota, from 2000-2012, 22 Canada lynx were reported as captured in traps and snares, of which at least 12 were killed. In Montana, since 2000, at least 15 Canada lynx have been caught in traps or snares set for other species. In Idaho, since 2012, at least four Canada lynx have been caught in traps or snares set for other species. These are reported instances. Not all instances of the trapping of lynx are reported in the states and tribal areas approved for export under the CITES wildlife export program.

34.     The incidental or illegal killing of individual Canada lynx can harm Canada lynx populations. Canada lynx home range sizes, based on daily and exploratory movements, can range from 15 to as many as 300 square miles. Some Canada lynx disperse – meaning moving permanently to a new home range – sometimes for hundreds of miles. Transient Canada lynx are important to the overall health of

Canada lynx populations in the contiguous United States, because the populations persist based in part on connectivity and interchange with Canada lynx in Canada.

35.    Canada lynx may not notice snares that are less than 5/64 inches thick. Snares less than 5/64 inches thick are allowed by states and tribes approved to participate in the CITES wildlife export program and that include habitat for Canada lynx. Canada lynx may be snared in snares that are narrower than 8 inches from side to side. Snares narrower than 8 inches from side to side are allowed by some states and tribes approved to participate in the CITES wildlife export program and that include habitat for Canada lynx.

36.    Online markets and other technological advances since adoption of CITES have made it possible to sell and ship bobcat, gray wolf, and other animals' pelts and parts to many parts of the world. There is international demand for bobcat, gray wolf, and other animals' pelts and parts. Prices for pelts are near or at record levels. The CITES wildlife export program creates, enables, and facilitates an international market for the export and sale of pelts, parts, trophies, garments, and other components of bobcats, gray wolves, and other animals trapped, caught, killed, or otherwise obtained in approved states or tribal areas. The international market for pelts, parts, trophies, garments, and other components of these animals creates or maintains incentive for individuals to trap, catch, kill, or otherwise obtain these animals. The international trade in animal pelts and parts authorized by the CITES wildlife export program is a significant contributing factor in the decline of certain animal populations, including some listed as threatened with extinction under the ESA.

37.    States and tribes approved to participate in the CITES wildlife export program manage harvest of the species that may be exported under the CITES wildlife export program. States and tribes approved to participate in the CITES wildlife export program control harvest of the species that may be exported under the CITES wildlife export program. The Service does not authorize, in whole or part, harvest of species that may be exported under the CITES wildlife export program. The Service does not regulate or control, in whole or part, harvest of species that may be exported under the CITES wildlife export program. The Service does not fund, in whole or part, harvest of species that may be exported under the CITES wildlife export program. The Service does not carry out, in whole or part, harvest of species that may be exported under the CITES wildlife export program.

38.    In 2017, the Service issued an Environmental Assessment ("EA") and Decision Record to evaluate environmental effects of the CITES wildlife export program. The EA fails to disclose all direct, indirect, and cumulative effects of the CITES wildlife export program. The EA fails to disclose all bases for the Service's determinations of non-detriment for bobcats, wolves, and other species approved for export under the CITES wildlife export program. The finding of no significant impact is incorrect, because the CITES wildlife export program may cause a significant environment impact. The Service should have prepared an environmental impact statement to evaluate effects of the CITES wildlife export program.

39.    Fourteen states and three tribal areas that participate in the CITES wildlife export program include lands within the range of the Distinct Population Segment

of Canada lynx in the contiguous forty-eight states. Canada lynx have been captured, trapped, or otherwise collected in traps or snares set for bobcats in states and tribal areas approved to participate in the CITES wildlife export program. The tagging and export of bobcat pelts and parts is a federal activity that may affect the Distinct Population Segment of Canada lynx listed as threatened with extinction under the ESA.

40.    In 2012, the Service issued a Biological Opinion under Section 7 of the ESA to evaluate effects on Canada lynx of bobcat trapping in states and tribal areas approved for export of bobcat pelts and parts under the CITES wildlife export program. The 2012 Biological Opinion renews, modifies, and extends a 2001 Biological Opinion evaluating the effects on Canada lynx of bobcat trapping in states and tribal areas approved for export of bobcat pelts and parts under the CITES wildlife export program. The 2012 Biological Opinion is in effect. In 2012, the Service found that since 2001, take of lynx attributable to the program has been limited to eight trappings where the lynx were released unharmed. In 2012, the Service determined that the export of bobcat pelts or parts under the CITES wildlife export program will not jeopardize the continued existence of the Distinct Population Segment of Canada lynx.

41.    The 2012 Biological Opinion incorporated an ITS. The ITS is in effect. The ITS establishes an amount or extent of allowed incidental take of Canada lynx by those seeking bobcats in the states and tribal areas approved for export of bobcats under the CITES wildlife export program. The amount or extent of incidental take established in the ITS is two Canada lynx may be killed and two Canada lynx injured annually due to trapping of bobcat in the states and tribal areas approved

for export of bobcats. If 10 lynx were injured in one year due to bobcat trapping in the states and tribal areas approved for export of bobcats, and none was killed, the amount and extent of take would not be exceeded. The ITS does not establish an amount or extent of kinds of "take" other than death or injury – such as "capture" -- of Canada lynx due to trapping of bobcat in the states and tribal areas approved for export of bobcats. The ITS does not define "injured."

42.     The Service requires states and tribes approved under the CITES wildlife export program to report to the Service any Canada lynx trapped within 10 working days. The Service requires states and tribes approved under the CITES wildlife export program to report to the Service any unanticipated harm to Canada lynx within 10 working days. The ITS does not define "unanticipated harm" to Canada lynx. States and tribes do not always report on Canada lynx trapped or caught by bobcat trappers. States and tribes do not always report on any unanticipated harm to Canada lynx. States and tribes rely on trappers' reports of trapping or capture of Canada lynx. Trappers do not always report to states and tribes when they trap or capture Canada lynx. A trapper may trap or capture a Canada lynx and release it, presuming it is uninjured. Determining whether a trapped or captured Canada lynx is injured requires special training or expertise. Not all trappers possess special training or expertise to determine if a trapped or captured Canada lynx is injured.

43.     The ITS includes a single reasonable and prudent measure. The reasonable and prudent measure is to, when issuing CITES export tags for bobcats to states and tribes, provide the states and tribes with information on Canada lynx identification, life-history, recovery needs, and references to current and ongoing

methodologies to reduce mortality and injury to Canada lynx when trapping bobcat. The reasonable and prudent measure does not minimize the level of incidental take of Canada lynx.

44.    The Service published a brochure stating nine methods for avoiding incidental take of Canada lynx while trapping bobcats or other furbearers. The Service has not required states or tribes approved for export of bobcats under the CITES wildlife export program to adopt any of the methods in the brochure as a condition for approval in the program. The Service has not required states or tribes to adopt any of the methods to minimize "take" of Canada lynx contained in the brochure as a term or condition in the ITS before being approved for export of bobcats under the CITES wildlife export program.

45.    The Service asserts that states and tribes that authorize or license bobcat trapping are immune from liability for incidental take of Canada lynx due to bobcat trapping under the ITS. The Service has not prepared an analysis under NEPA of the environmental effects of extending immunity for incidental take of Canada lynx due to bobcat trapping to states and tribes approved for export under the CITES wildlife export program.

46.    Sometimes trappers stockpile bobcat pelts to wait for the most lucrative time period to export them.

### CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION: NEPA

47.    Plaintiff hereby incorporates all preceding paragraphs.

48.    NEPA requires federal agencies to prepare, for every major Federal action significantly affecting the quality of the human environment, a detailed

environmental impact statement ("EIS") that addresses, among other things, (1) the environmental impact of the proposed action (2) any adverse environmental effects which cannot be avoided, and (3) alternatives to the proposed action. 42 U.S.C. § 4332(C)(i)-(iii). "Major federal action" includes actions with effects that may be major and which are potentially subject to federal control and responsibility. 40 C.F.R. § 1508.18. "Actions" include "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies." 40 C.F.R. § 1508.18(a). Federal agencies may prepare an EA to determine whether an EIS is required. 40 C.F.R. § 1508.9.

49.    A NEPA analysis must state a reasonable purpose and need. 40 C.F.R. § 1502.13. The EA states that the purpose and need is to provide a framework for the permitting system that allows the export of species under the CITES wildlife export program. As a result, the EA considers and discloses information only within an improperly narrow framework, and fails to include any required analysis of whether to continue the program at all, as well as the varied environmental effects of truly different alternative ways of doing so.

50.    A NEPA analysis must consider the direct, indirect, and cumulative effects of the proposed action and a reasonable range of alternatives to it. 40 C.F.R. § 1502.16. The EA fails to consider or disclose direct, indirect, and cumulative environmental effects of the CITES wildlife export program. The EA improperly constrains its analysis of effects and avoids taking a hard look at the effects of trapping and snaring that harvest species exported under the CITES wildlife export program.

51.    A NEPA analysis must contain high quality information and accurate scientific analysis. 40 C.F.R. § 1500.1(b). The EA for the CITES wildlife export program contains neither. It is bereft of high quality information and accurate scientific analysis about the effects of allowing and facilitating trade in species covered under the program, including but not limited to effects to covered species, and effects to species that are not covered (bycatch). The EA states that the Service requires monitoring and reporting on effects to covered species, but the EA lacks that data and analysis, and it completely lacks data or analysis of effects to bycatch species.

52.    A NEPA analysis must include a reasonable range of alternatives. The EA contains an inadequate range of alternatives. No alternative[s] contain reasonable conditions on state and tribal participation in the CITES wildlife export program that would ameliorate harm from trapping and snaring to covered species and to bycatch, including but not limited to species such as Canada lynx and wolverine.

53.    Under Ninth Circuit caselaw, a federal agency that extends immunity for incidental take of an ESA-listed species via an ITS must prepare a NEPA analysis of the effects of doing so. The EA incorporates the 2012 Biological Opinion and ITS related to bobcat trapping that incidentally takes Canada lynx, but the EA does not properly analyze the environmental effects of the ITS.

54.    The Service violated NEPA by failing to prepare an EIS for the CITES wildlife export program. Among other things, the proposed actions threatens a violation of federal law (ESA), there is significant controversy about effects, there are unexamined cumulative effects of trapping and snaring species for export, and

there are potential impacts on ESA-listed species, including but not limited to

Canada lynx. The presence of these and other factors demands and EIS.

### SECOND CAUSE OF ACTION: ESA

55.    Plaintiff realleges all previous paragraphs.

56.    The 2012 Biological Opinion is arbitrary and capricious and violates the

ESA. The 2012 Biological Opinion does not consider or disclose, and is not based

on, all of the effects on Canada lynx of state and tribal bobcat trapping programs.

The 2012 Biological Opinion does not consider or disclose, and is not based on,

the best available science related to the number of lynx caught, trapped, or killed in

the states and tribal areas approved for export of bobcats under the CITES wildlife

export program. The 2012 Biological Opinion does not consider or disclose, and is

not based on, the best available science related to methods to minimize take of

lynx. The Biological Opinion is not based on the best available science about the

number of Canada lynx caught, trapped, or otherwise taken. The Biological

Opinion is not based on the best available science about whether and how Canada

lynx may be hurt or injured after being caught in traps and snares set for other

species. The Biological Opinion is not based on the best available science about

the effects to lynx populations of the trapping or snaring of individual lynx. The

Biological Opinion fails to properly analyze the effects of the action (including the

direct, indirect, and cumulative effects) on Canada lynx as defined by 50 C.F.R. §

402.02 and required by 50 C.F.R. § 402.14.  Pursuant to the 2001 Biological

Opinion, the Service was only authorized to renew and extend the 2001 Biological

Opinion "subject to an evaluation of the recovery of [Canada lynx] and the

existence of additional documents providing protection to the lynx such as a 4(d)

rule." The Service never undertook such an evaluation and no additional documents providing protection to lynx from trapping, including a 4(d) rule, were finalized. The Service's determination in the 2012 Biological Opinion that the earlier analysis of impacts to Canada lynx from the CITES export program in the 2001 Biological Opinion is "still valid" is arbitrary and capricious.

57.     The 2012 Biological Opinion is accompanied by an ITS. An ITS must establish an amount or extent of incidental take of Canada lynx. Take is defined in the Endangered Species Act as "harass, harm, pursue, hunt, shoot, would, kill, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. 1531(19). The amount or extent of incidental take this ITS allows from trapping in the states and tribal areas approved for export of bobcat pelts and parts is two killed Canada lynx and two injured Canada lynx annually. The ITS does not address all the forms and ways in which Canada lynx may be incidentally taken through trapping or snaring by those who seek to trap bobcats in states and tribal areas approved for export. The ITS does not establish an amount or extent of incidental take of Canada lynx due to trapping alone, capture alone, or collection alone, all of which are within the definition of "take" in the ESA. The ITS does not define "injured." If fewer than two Canada lynx are killed annually, the ITS does not limit the extent of amount Canada lynx that may be injured due to trapping of bobcats in states and tribal areas approved for the export of bobcat pelts and parts. The ITS purports to extend immunity from take liability to individuals, states, tribes, or other entities that may or may not be qualified to determine if a trapped or snared lynx has been injured. The ITS fails to include reasonable terms and conditions to minimize take of lynx. The ITS does not require as a term or

condition that states or tribes adopt any of the nine measures the Service published in its brochure to minimize risk of take of lynx. The ITS fails to include adequate reporting and monitoring to ensure compliance with the ITS and ensure the amount of incidental take is not exceeded. The ITS does not include any reasonable and prudent measures or terms and conditions that apply to states or tribes participating in the CITES export program.

58.     Under certain circumstances, an ITS may shield a non-federal entity from liability for incidental take of an ESA-listed species. 50 C.F.R. § 402.14(i). In order to provide such a shield, two tests must be met. The "applicant" must be "any person, as defined in section 3(13) of the Act, who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action." 50 C.F.R. § 402.02. The "action" is defined as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. . . ." *Id*. The states and tribes that apply for permission to export species under the CITES wildlife export program do not require approval from the Service to authorize trapping or snaring. The Service does not authorize, fund, or carry out, in whole or in part, the actions that directly cause incidental take of Canada lynx, which include trapping and snaring. The Service's determination that the states and tribes are "applicants" under 50 C.F.R § 402.02 is arbitrary and capricious.

**REQUEST FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

A.      Declare the Service violated NEPA as Plaintiff alleges;

B.      Declare the Service violated and continues to violate the ESA as Plaintiff alleges;

C.      Set aside the EA, and Decision Notice and FONSI;

D.      Set aside the 2012 Biological Opinion and ITS;

E.      Enjoin the Service from issuing tags that authorize or otherwise authorizing the export of bobcat pelts or parts from states and tribal areas that include habitat for Canada lynx;

F.      Award Plaintiffs their attorneys' fees, costs and expenses of litigation;

G.      Issue any other relief this Court deems necessary, just, or proper, or that Plaintiff subsequently requests.

        Date: July 20, 2017.            Respectfully submitted,

                                        /s/ Peter M.K. Frost
                                        Peter M.K. Frost
                                        Sarah McMillan
                                        Matthew K. Bishop

                                        *Attorneys for Plaintiff*